**Opinion issued August 17, 2023**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-22-00580-CV

_____

## IN RE COMMITMENT OF ROBERT CURTIS HOWARD

---

### On Appeal from the 179th District Court
### Harris County, Texas
### Trial Court Case No. 1015159-0101Z

---

## MEMORANDUM OPINION

In this proceeding under the Texas Civil Commitment of Sexually Violent

Predators Act (the "SVP Act"), a jury found appellant, Robert Curtis Howard, to be

a sexually violent predator.[1]  Based on that finding, the trial court adjudged appellant

---

[1]  *See* TEX. HEALTH & SAFETY CODE ANN. §§ 841.001–.151.

a sexually violent predator and ordered his civil commitment.[2]  In four issues, appellant contends that the trial court erred in concluding that the SVP Act complies with due process and in prohibiting him from questioning the State's expert witness on certain issues and the evidence is legally and factually insufficient to support the jury's finding that he is a sexually violent predator.

We affirm.

## Background

In its petition, the State alleged that appellant was a sexually violent predator, and he had twice previously been convicted of the offense of indecency with a child.[3] It requested that he be found a sexually violent predator and be committed "for treatment and supervision to be coordinated by the Texas Civil Commitment Office."[4]

Appellant answered, generally denying the State's allegations.  Appellant then filed a motion to dismiss, arguing that dismissal of the civil commitment proceeding against him was required "because the [SVP Act] lack[ed] directions and definitions for certain critical terms, which permit[ted] an interpretation that violate[d] the Fifth and Fourteenth Amendments [of the United States Constitution] by depriving him

---

[2]     *See id.* §§ 841.003, 841.081.

[3]     *See* TEX. PENAL CODE ANN. § 21.11(a).

[4]     *See* TEX. HEALTH & SAFETY CODE ANN. § 841.081.

2

of liberty without due process of law." Alternatively, appellant "request[ed] that the [trial] [c]ourt instruct the jury in a manner that ensure[d] that a civil commitment verdict [complied] with due process constraints."

Specifically, appellant argued that the "current process of civil commitment of sex offenders in Texas" violated his due process rights by "permit[ting] post-sentence confinement of a[] convicted sex offender with two or more convictions, regardless of [the] level of dangerousness, because beyond a mere possibility ha[d] been permitted as the standard of risk required," a standard that "insufficiently distinguish[ed] the dangerous sexual offender" as required by United States Supreme Court precedent.[5]  (Internal quotations omitted.)  Appellant also asserted that the SVP Act impermissibly failed to provide definitions for key terms, such as "predisposes," "likely," "menace," and "beyond a mere possibility" and thus lacked a standard or "method to ensure that only those with serious difficulty controlling behavior . . . [were] committed."  (Internal quotations omitted.)

According to appellant, the "due process defect" he described could "be remedied by addressing 'serious difficulty controlling behavior' in the [trial court's] jury instructions" in any or all of four ways:

(1)     "Directly, by adding language indicating that the level of predisposition or likelihood required is such that the person has 'serious difficulty controlling behavior'";

_____

[5]     *See Kansas v. Crane*, 534 U.S. 407, 413 (2002).

3

(2) "Indirectly, by indicating that 'likely' has the common sense meaning of 'probable'—and that 'beyond a mere possibility' is meant to indicate a necessary attribute of 'likely,' or 'probably,' but is not a definition—and 'predisposes' means 'makes the person likely to'";

(3) "By clarifying that a 'menace' in this context means one who is a dangerous threat that must be confined for public safety"; or

(4) "[B]y adding 'unless confined to a secure facility' onto the behavioral abnormality definition or the second part of the SVP definition."

Appellant also filed a proposed jury charge. But appellant did not include in his proposed jury charge any instructions consistent with in the arguments he made in his motion to dismiss.

In its response to appellant's motion to dismiss, the State pointed out that the Texas Supreme Court had recently "reaffirmed that the SVP Act [wa]s constitutional" and "clarified that the only elements" the State had to prove to satisfy the definition of a behavioral abnormality "[were] the two elements defined in the [SVP Act]."[6] The State also asserted that the SVP Act's definition of "behavioral abnormality" "adequately subsume[d] the inquiry of whether a person ha[d] serious difficulty controlling behavior." And according to the State, appellant's "serious difficulty controlling his behavior" was not part of the SVP Act, and "a jury question

---

[6] *See In re Commitment of Stoddard*, 619 S.W.3d 665, 677–78 (Tex. 2020).

4

on it [wa]s not necessary for [the] jur[y] to render a verdict that result[ed] in a civil commitment."

The trial court denied appellant's motion to dismiss.

At trial, Darrel Turner, the State's expert witness, testified that he was a licensed doctor of clinical psychology and had been licensed to practice forensic psychology since 2013. Turner had coauthored research into sexual offending for peer-reviewed publications. He had also "conducted presentations and training in conducting risk assessments of sex offenders" and in the "SVP process[] and the role of experts in it." And Turner had "treat[ed] sex offenders."

In his forensic practice, Turner had done "a lot of work with risk assessment of . . . sexually violent predators." He had testified on behalf of both the State and the defense in other cases. Occasionally, if allegations of sexual abuse arose in litigation, courts would appoint him to "consult with the law enforcement agencies" to "give them a complete picture" of the alleged conduct involved. He had also performed "juvenile and adult competency evaluations, sanity offense evaluations," and "general risk assessments."

Turner explained that in forensic psychology, the psychologist applied his "knowledge as an expert in the field of psychology" to a legal question. Here, the question was whether an individual had a "behavioral abnormality" that made him

"likely to engage in a predatory act of sexual violence" under the SVP Act.[7] "Behavioral abnormality," according to Turner, "refer[red] to a congenital or acquired condition that by affecting a person's emotional or volitional capacity predispose[d] that person to commit a sexually violent offense to the extent that they bec[a]me a menace to the health and safety of other people." The term "behavioral abnormality" also "ha[d] a mental health meaning."

Turner acknowledged that the SVP Act did not define "likely." As a forensic evaluator, he understood that if a legal term was not defined, he was "expected to use common sense and [his] own understanding of what the word mean[t]" in "everyday usage." Turner understood "likely" as meaning not "merely possible but probable."

Turner further explained that he would "apply the different definitions that [were] in the law to [the] mental health definitions and factors" to try to help the jury determine whether [it] thought appellant "suffer[ed] from th[e] condition." Turner was testifying to inform the jury "what research sa[id] about an offender like" appellant and the characteristics that increased "or maybe even decrease[d] his likelihood of reoffending." The characteristics that Turner considered were ones "that researchers and scientists ha[d] found when studying sex offenders and

---

[7] *See* TEX. HEALTH & SAFETY CODE ANN. § 841.003(a)(2).

following them for long periods of time and seeing if they commit[ted] more offenses." Through such research, certain characteristics were identified as risk factors that increased an individual's likelihood of reoffending.

In opining as to whether an individual had a behavioral abnormality, Turner was not "predicting the future." He considered whether there was "some evidence of sexually deviant interests or a sexually deviant interest that could create a problem" if the individual had "difficulty controlling it." Turner also considered whether the individual had "some condition that ma[de] it hard for him to control himself when it comes to his sexual urges." If the individual did, it meant that he was "likely to reoffend and create more victims." Thus, "[t]he two main risk factors" that Turner considered in determining whether an individual had a behavioral abnormality were "sexual deviance," meaning that the individual had "some sexual interest that require[d] victimizing someone in order to satisfy [it]" and "antisociality, which [wa]s kind of a criminal, self-indulgent mindset" where the individual did not "mind breaking rules and stepping on other people to get what [he] want[ed]." When those two factors were "present together, the likelihood of reoffending" increased "considerably." Turner determined that both factors for a behavioral abnormality were "present in this case."

Turner explained that in rendering an opinion in a case, he first familiarized himself with various records, including "court documents related to the

7

[individual's] offenses," "police investigation narratives," prison disciplinary records, prior psychological evaluations, "medical records, mental health records," and other background information to "prepar[e] for an in-person evaluation." After he interviewed the individual, Turner scored certain tests, which helped him "determine . . . what risk factors [we]re present" that might increase or lower the individual's risk level. The tests Turner used included the PCL-R, which was "a checklist" of twenty personality traits that were "typically found" in "psychopathic individuals" and was "the most widely used instrument to measure psychopathic characteristics in an individual." Turner also used the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, known as the "DSM-5," to diagnose any mental illness or mental disorders. Turner then "factor[ed] all that" information "in," considered the statutory definition, and "ultimately [came] to an opinion" about whether the individual had a behavioral abnormality.

Turner opined that appellant "suffer[ed] from a behavioral abnormality that ma[de] him likely to commit predatory acts of sexual violence." Turner was testifying just to "present that opinion" to the jury, which might or might "not agree with [his] opinion."

Turner was not able to do an in-person interview with appellant, and technical difficulties prevented them from doing the interview over "Zoom with the visual and

8

the auditory part."[8]  Instead, Turner interviewed appellant over the telephone, which

"was not an ideal circumstance," but Turner was still "able to ask all the questions

[he] needed to ask."  Appellant was cooperative and answered Turner's questions.

Turner also noted that the records he reviewed had "multiple interviews" with

appellant, including a videotaped deposition, which gave Turner an opportunity to

see appellant respond to questioning.

After reviewing the pertinent records and interviewing appellant, Turner

determined that appellant had "[p]edophilic disorder, nonexclusive type, attracted to

female."  Pedophilia was a "chronic condition" that was based on a pattern of

behavior, not a single event.  Turner also diagnosed appellant with "an antisocial

personality disorder as well as a high level of psychopathic characteristics."

Turner testified that according to appellant's records, appellant's first sexual

offense for which he was convicted occurred in February 2000, when appellant was

twenty years old.  Appellant was convicted of the offense of indecency with a child,[9]

and the complainant was a seven-year-old girl.  Appellant committed the offense at

a park in a residential neighborhood where the complainant and her friend were

---

[8]     Zoom is a videoconferencing platform.  *See In re D.L.W.W.*, 617 S.W.3d 64, 71–73 (Tex. App.—Houston [1st Dist.] 2020, no pet.); *see also United States v. Sheppard*, Crim. Action No. 5:17-CR-00026-TBR, 2020 WL 6534326, at *1 (W.D. Ky. Nov. 5, 2020) (mem. op. and order).

[9]     *See* TEX. PENAL CODE ANN. § 21.11(a).

playing. Appellant "started playing basketball" by himself. When "he would miss [a basket]," the complainant or her friend "would pick the ball up and he would offer them a piece of gum if they would bring the ball over to him." After "a couple of times," appellant "fondled the genitals" of the complainant when she brought him the ball. When appellant left the park, the complainant and her friend "watched to see which trailer he went into," and "then they went home and told the[ir] parents" what appellant had done.

According to Turner, "[a]cross [appellant's] interviews," including in parole hearings, a sex offender clinical program interview, and his interview with Turner, appellant denied committing the indecency-with-a-child offense, occasionally admitting only that "[m]aybe [he] accidentally . . . brushed against [the complainant's] vagina but if [he] did, [he] didn't mean to." (Internal quotations omitted.) In his videotaped deposition, though, appellant "admitted for the first time that he . . . touch[ed] [the complainant's] vagina purposely," although "[h]e denied having fantasized about it" or having "planned to do it." Turner observed that appellant would not admit that he had a sexual attraction to children; "[h]e just said he didn't know why he did it."

Turner explained that the younger a perpetrator's child victim was, the "more deviant" the perpetrator's sexual attraction was considered. The fact that appellant

10

and the complainant "were strangers on the day of the offense" was also a risk factor because "if an offender ha[d] a stranger victim," they were "more likely to reoffend."

Turner further testified that he found appellant's denial about having committed the indecency-with-a-child offense concerning because it showed that appellant was "unaware of the reason for his offending behaviors." Turner explained that if an individual did not understand why he was offending, it was "much harder" to restrain himself "from offending again." And Turner found it significant that appellant was on probation for a "nonsexual offense" when he committed the first indecency-with-a-child offense. Turner explained that it was "a risk factor" if "someone offend[ed] sexually while" he was "being supervised for some other offense" because when a person was under supervision, he was "on [his] best behavior." The probation officer could "come by anytime," and the person had to "pay [his] dues" or he would "go[] back to prison." "So[,] the fact that [appellant] commit[ted] a sex offense while he [was] on probation for something else" showed that appellant had "problems controlling [his] behavior" and thus indicated a greater likelihood that he would reoffend.

Turner observed that appellant was sentenced to confinement for three years for the first indecency-with-a-child offense. During his time in prison, he committed various disciplinary infractions, including "numerous" sexual misconduct infractions. Those infractions included instances in which appellant "expos[ed] his

penis to female staff members" and masturbated in front of them. Turner "consider[ed] masturbating in front of an unwilling female correctional officer to be victimizing that correctional officer," so he viewed those instances of sexual misconduct as having "creat[ed] more victims." According to Turner, appellant's "sexually acting out while in prison" "sp[oke] to a behavioral abnormality."

Turner also noted that appellant violated the terms of his release following confinement by failing to register as a sex offender within four months after leaving prison. The records Turner reviewed showed that the authorities tried to "help[] him out" and gave him several opportunities to register, but "he still just didn't get it together." Ultimately, appellant was convicted of the offense of failure to register as a sex offender and sentenced to confinement for one year.[10]

And appellant's subsequent criminal history contributed to Turner's opinion that appellant had a condition that made "it hard for him to control himself when it [involved] his sexual urges." Only eight months after his release from confinement for the failure-to-register offense, appellant "committed another sexual offense" of indecency with a child against a six-year-old girl, the second complainant, who was playing outside at an apartment complex.[11] Appellant had not previously met the second complainant and was not a resident of the apartment complex. In committing

---

[10]     *See* TEX. CODE OF CRIM. PROC. ANN. art. 61.102.

[11]     *See* TEX. PENAL CODE ANN. § 21.11(a).

12

the offense, appellant "walked past" the second complainant, then "reached down" and touched her vagina.

The fact that appellant committed a similar offense after having already been convicted and imprisoned for the first indecency-with-a-child offense weighed "quite heavily" in Turner's determination that appellant had a behavioral abnormality. To Turner, appellant's criminal conduct "[was] what a behavioral abnormality look[ed] like." Turner explained that appellant was "an individual who ha[d] sexually deviant urges" that he could not control, "to the point that . . . eight months after getting out of prison for not registering [as a sex offender], which occurred only four months after getting out of prison" for his first indecency-with-a-child offense, he "[was] committing another sexual offense" against another young girl.

Turner noted that typical sex offenders who were convicted and served prison time for a first sexual offense do not commit a second sexual offense. An offender who commits a second sexual offense, according to Turner, is "four times more likely to commit another offense than the average sex offender." "So once [a sex offender] start[s] that pattern of reoffending after [he has] been punished, [his] likelihood of reoffending goes up," and that was what appellant's history showed.

Further, Turner pointed out that appellant had consistently denied having committed the second indecency-with-a-child offense, even in his videotaped

13

deposition, "where he [had] made somewhat of a statement of admission" about having committed the first indecency-with-a-child offense. Turner recounted that appellant had stated that he was only at the apartment complex where he committed the second offense because he had bought marijuana there, and he blamed his second conviction for the offense of indecency with a child on a "revenge scheme" where the "police [had] colluded with the drug dealers to have him thrown back in prison because he was a sex offender."

Turner was not "surprised" by a sex offender denying having committed the sex offense for which he was confined. But whether the offender admitted that he committed the offense was significant because it showed how he was "handling it," how he felt about it, and whether he had "a desire" not "to reoffend." To Turner, appellant's denials and his "revenge scheme" story indicated that appellant would have "a poor prognosis for progress in [sex offender] treatment" because he lacked "self-knowledge and self-awareness," "remorse," and "empathy." Turner explained that those deficits were "all aspects of antisociality."

According to Turner, at the time of trial, appellant was still serving his sentence for the second indecency-with-a-child offense. Turner noted that since appellant began serving that sentence, he had received eighty-seven disciplinary infractions, eighteen of which "were for sexual misconduct." The sexual misconduct that he had committed while in prison was similar in nature to the sexual misconduct

14

he had committed while in prison for the first indecency-with-a-child offense. Appellant committed his most recent sexual misconduct infraction in 2020, so "[h]e ha[d] been doing that up until" shortly before trial. That misconduct apparently ceased about the time that appellant became eligible for parole.

Turner diagnosed appellant with antisocial personality disorder. Turner explained that generally people who have antisocial personality disorder "feel very entitled and self-important." They believe "that other people are somewhat beneath" them and do not "feel empathy for other people." They have "no remorse for their actions" and "tend to be manipulative, pathological liars. They don't do well with authority" or "following the rules" because "they think they're above that. And they don't mind victimizing people to get what they want and that's how they live their life." "[F]or the most part," Turner observed, appellant did not accept responsibility for his criminal history. Turner saw in appellant a "pattern" of "just not generally owning up" to his "own mistakes" and misconduct.

According to Turner, appellant had specific antisocial traits. When someone had "a sexual deviant attraction, in this case to children," and was "antisocial enough to not feel remorse when [he] victimize[d] someone else" but rather, "fe[lt] like [he] was] entitled to get what [he] want[ed], then that person becomes especially dangerous." Turner observed that "sex offenders with that combination" had an "exponential[ly] increase[d] risk of reoffending sexually."

In applying the PCL-R checklist to appellant's characteristics, Turner concluded that appellant had a high degree of psychopathy. Turner considered it significant that appellant had his probation revoked because it showed that appellant had "poor behavior control" and "impulsivity." Appellant also had higher scores on the traits of "problematic sexual behavior; irresponsibility; failure to take responsibility for [his] own actions; a conning, manipulative interpersonal style; a lack of remorse, a callousness"; and "a lack of empathy." Turner did not find that appellant exhibited all the possible traits of psychopathy, but the traits for which he found appellant to have an elevated score "were some of the ones that are most relative to a behavioral abnormality being present."

Turner further explained that appellant's mental health records from prison gave Turner the impression that appellant was "someone who [wa]s manipulative in [his] use of the mental health system in prison to get certain things that [he] want[ed]." Appellant had admitted as much in acknowledging that he had attempted suicide but "didn't really want to die" and "was just trying to get attention." (Internal quotations omitted.) Appellant also had said that he "hear[d] voices," but later denied it and explained that he "just needed to get out" of his prison unit. Turner did not diagnose appellant with the mental illnesses that were documented in appellant's prison records because there was "so much conflicting evidence," which indicated to him that appellant was manipulating the system.

Turner did diagnose appellant with "cannabis use disorder in remission." And he noted that appellant had a history of substance abuse that "carried on into his time in prison," where "he was found storing" several gallons of homemade alcohol and "admitted to using synthetic marijuana." Turner observed that "if someone is using substances while [he is] offending, that's a risk factor" because the person "is more likely to reoffend than someone [who] offends" when sober.

Turner acknowledged that appellant had discussed his religious views and his belief that he had changed due to religion. Turner did not question the sincerity of appellant's beliefs but noted that "[t]he problem is that Christians can make mistakes and slip up, too. It[] [was] not some guarantee that [appellant was] not going to reoffend." Further, according to Turner, if appellant's espoused religious faith was "not real" and if it was "something that he [was] using to manipulate," then obviously "that[] [was] not a good thing anymore." So, Turner did not view appellant's faith as a mitigating factor that would help keep appellant from reoffending.

Turner credited as "a protective factor" that appellant took "advantage of the positive things that prison ha[d] to offer," including getting "his GED" and training in trades as well as taking "some self-help courses." And appellant's age of forty-two was also a protective factor. On balance, though, Turner concluded that appellant "represent[ed] a high degree of risk for reoffending."

17

During trial, the State also read to the jury the following admissions made by appellant in response to the State's request for admissions:

- Appellant was "the same Robert Curtis Howard identified in the attached penitentiary packet containing the conviction of indecency with a child in the second degree in Cause No. 1015159";

- Appellant "was convicted of indecency with a child in the second degree on or around January 28th, 2005, in Cause No. 1015159";

- Appellant was "the same Robert Curtis Howard identified in the attached penitentiary packet containing the conviction indecency with a child in the second degree in Cause No. 2000-CR-2210";

- Appellant "was convicted of indecency with a child in the second degree on or around July 21st, 2000, in Cause No. 2000-CR-2210";

- Appellant "was convicted of failure to register as a sex offender on or around February[] 2003";

- Appellant "was sentenced to one year of jail for [his] conviction of failure to register as a sex offender";

- Appellant "received 18 disciplinaries in prison for sexual misconducts";

- Appellant "believe[d] that" he did "not need sex offender treatment"; and

- Appellant did "not believe" that he was "a sex offender."

Appellant testified that he was placed in foster care at an early age and grew up in a boys' home. By the time he was nine years old, he had used marijuana and by age fourteen or fifteen, he had used LSD and alprazolam. Appellant also acknowledged that he had used cocaine.

After appellant left the boys' home, he spent two years in the National Guard. During that time, he was arrested and convicted twice on misdemeanor charges, one for the offense of theft and the other for the offense of possession of marijuana. For the theft offense, appellant received six months' probation, but "turn[ed] [him]self in" and served jail time instead because being on probation "conflict[ed] with [his] work." As to his possession-of-marijuana offense, appellant was placed on probation for one year. But he "ended up smoking" marijuana once while he was on probation and "knew that [he] wasn't going to be able" to pass the scheduled urinalysis test, so he "didn't report" for the test and his probation was revoked.

Before his probation was revoked, appellant was also arrested for the first offense of indecency with a child. As to that offense, appellant recalled that he was "playing basketball" when "the girls came around," and when the complainant "brought the basketball up, [he] reached down and grabbed her" in "[h]er private area." Appellant pleaded no contest to the offense of indecency with a child and was convicted. After that, he was discharged from the National Guard.

As to his motive for committing the first indecency-with-a-child offense, appellant stated that he did not know why he grabbed the complainant's vagina. He denied having any sexual thoughts about the complainant before grabbing her.

19

He "had never seen her before." He acknowledged that he had told the State that he had experienced an "urge" to touch the complainant. According to appellant, it was "the only way that [he] could think to describe it because . . . when it happened," he "freaked out that [he] did it and [he] just took off."

As to why appellant had repeatedly denied having committed his first indecency-with-a-child offense until his videotaped deposition, he explained that "by then, [he] had already been through a lot of classes," including "cognitive intervention" with "the veteran program pod." Appellant also "had given [his] life to Christ." So, he "just felt it was the right thing to do instead of . . . just lying about it."

Appellant was sentenced to confinement for three years for his first indecency-with-a-child offense. And about four or five months after his release from confinement, he was arrested for the offense of failure to register as a sex offender. He was convicted of that offense and sentenced to confinement for one year.

A few years later, when appellant was twenty-five years old, he was arrested for his second indecency-with-a-child offense. He understood that at the time, he was prohibited from having contact with any minor child under the sex offender registration requirements made applicable to him after his first indecency-with-a-child offense. Appellant explained that he had gone to the apartment complex where the second complainant was "to buy marijuana there." He

did not recall watching the children play at the apartment complex and denied that he had touched the second complainant's vagina.

Appellant pleaded guilty to the offense of sexual indecency with a child and was again convicted. His punishment was assessed at confinement for eighteen years and, at the time of trial, he was still in prison for that offense.

Appellant acknowledged that during his time in prison, he had "made a lot of mistakes and caught a lot of cases." As for the eighteen sexual misconduct disciplinary infractions he had while in prison, appellant explained that they were for public masturbation, "but they all read public because that's the way the offense [wa]s written," even though a prisoner "could be in [his] cell," or "in the shower." A prisoner could "receive masturbation cases anywhere in prison."

In the previous two-and-a-half years "or so," appellant believed that he had "got[ten] [his] head together." He had taken "a lot" of classes, including trade classes, "to get prepared for the world when [he] g[ot] out so that" he would not reoffend and could "support [him]self" and "become a productive member of society."

Appellant believed that "at one time [he] was a sex offender" but that because his "life ha[d] changed so much," he was no longer a sex offender and would not reoffend. Appellant stated that while he did not personally believe that he needed to stay away from children, he understood that he "should stay away from children

completely as much as possible . . . to avoid any situation that would cause [him] to get in trouble" for violating the terms of his sex offender registration.

Appellant described Merry Wilkins as "his support system," a "family friend" and one of his "Christian sisters." Wilkins was in a prison ministry called "Conviction for Christ." Appellant denied that he had a romantic relationship with Wilkins but acknowledged that he had stated in his videotaped deposition that he did have some sort of a romantic relationship with Wilkins. Also, according to appellant, he had confessed to Wilkins that he had committed his first indecency-with-a-child offense.

Appellant expressed an interest in going to "bible college" and participating in a prison ministry. He also expressed a desire to participate in sex offender treatment. But he did not believe that he should spend ten to fifteen years "stuck in civil commitment."

Merry Wilkins testified that she was a resident of Harris County, Texas and was a "private home health care provider." She also participated in a prison ministry and outreach. She "partner[ed] with Conviction for Christ Ministries out of Albuquerque, New Mexico," and "volunteer[ed] with [Conviction for Christ] Ministries" in Houston.

Wilkins described appellant as her "brother in Christ." She met appellant about twenty-one years ago, before he was in prison, "[t]hrough a mutual friend."

They "bonded over time," "writing back and forth," and "then even more so after he found Christ."

Wilkins agreed that she had been a source of encouragement for appellant and had offered to support appellant's "future plans." She explained that her ex-husband was "a professional drywall specialist" and she was "a cleaning crew of one." Her "prayer [wa]s that" when appellant "c[ame] home," they could "add him to the crew" to help them do "new home construction." She "pray[ed] that [appellant]" would be released from prison, and she would "offer him a home."

Wilkins believed that appellant had been wrongfully convicted of his second indecency-with-a-child offense. She did not know the details of either of appellant's indecency-with-a-child offenses. But she believed that appellant was safe to be around children.

During the charge conference, appellant renewed his objections orally from the motion to dismiss, asserting that the SVP Act was unconstitutional and requesting "clarifying language indicating . . . either what a menace [wa]s, that [it was] less confined in a secured facility," and that "serious difficulty controlling behavior be included," or that it be made "clear that . . . 'likely'" as used in the SVP Act was "the common[] [sense] definition and not a term of exclusion, the 'beyond a mere possibility.'" The trial court denied appellant's oral objection to the jury charge and stated that it was "not going to add that language to the jury charge."

The trial court read the charge to the jury and, after closing arguments, the jury found beyond a reasonable doubt that appellant was a sexually violent predator. Based on the jury's finding, the trial court ordered that appellant be civilly committed.

## Due Process

In his first issue, appellant argues that Texas law does not adequately ensure that only those who "have serious difficulty controlling their behavior" are civilly committed because it has "no statutory or judicial mechanism that clearly indicates the level of risk that must be present in order to civilly commit someone." (Internal quotations omitted.) According to appellant, the absence of such a mechanism risks the commitment of individuals "who do not have serious difficulty controlling their behavior, in violation of" their federal constitutional rights as recognized by the United States Supreme Court in *Kansas v. Crane*. *See* 534 U.S. 407 (2002). Specifically, appellant argues that the SVP Act "permits an interpretation that violates the Fifth and Fourteenth Amendments [of the United States Constitution] by depriving respondents of liberty without due process of law" because the SVP Act does not include a "method to ensure that only those with serious difficulty controlling behavior—a small, non-ordinary group of recidivists—are committed." But "[a]side from the drastic remedy of declaring the SVP [Act] unconstitutional," appellant asserts that courts can provide due process protection by "addressing

24

serious difficulty controlling behavior in the jury instructions." (Internal quotations omitted.)

In 1999, the Texas Legislature enacted the SVP Act to protect the public from a "small but extremely dangerous group of sexually violent predators" who "ha[d] a behavioral abnormality that [wa]s not amenable to traditional mental illness treatment modalities and that ma[de] the predators likely to engage in repeated predatory acts of sexual violence." TEX. HEALTH & SAFETY CODE ANN. § 841.001. The SVP Act provides for the involuntary civil commitment, by means of outpatient treatment and supervision, of a repeat sexual offender who is found to be a sexually violent predator. *Id.* §§ 841.003(a), 841.081(a).

In his appellant's brief, appellant asserts that certain jury instructions should have been added to the trial court's jury charge to safeguard his due process rights. He proposes:

(1)    adding language indicating that the level of predisposition or likelihood required is such that the person has "serious difficulty controlling behavior";

(2)    including a definition of "likely" as "probable" and "predisposes" as "makes the person likely to";

(3)    clarifying that "menace" means one who is a dangerous threat that must be confined for public safety; and/or

(4)    adding "unless confined to a secure facility" to the definition of behavioral abnormality.

(Internal quotations omitted.) According to appellant, without such instructions, it was possible to find that he had a behavioral abnormality on nothing more than evidence of his prior crimes.

In his motion to dismiss in the trial court, appellant proposed a mix-and-match menu of possible jury instructions, some unspecified combination of which, he asserted, would supplement the SVP Act language enough for it to pass constitutional muster. But appellant did not request any jury instruction that was specific enough to permit the trial court to determine whether it was substantially correct and render a ruling on whether to submit it. Texas Rule of Civil Procedure 278 provides that the "[f]ailure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment." TEX. R. CIV. P. 278; *see Wheelbarger v. Landing Council of Co–Owners*, 471 S.W.3d 875, 898 (Tex. App.—Houston [1st Dist.] 2015, pet. denied); *Bayer Corp. v. DX Terminals, Ltd.*, 214 S.W.3d 586, 602–04 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); *see also Ezenagu v. Olagundoye*, No. 01-20-00334-CV, 2021 WL 4994376, at *9 (Tex. App.—Houston [1st Dist.] Oct. 28, 2021, no pet.) (mem. op.) (request for jury instruction is not substantially correct if it is too vague). As a result, we hold that appellant did not preserve his first issue for appellate review.

26

## Exclusion of Evidence

In his second issue, appellant argues that the trial court erred in sustaining the State's objection and preventing him from eliciting testimony from Turner about whether Turner had researched the accuracy of his past opinions that certain persons did not have a behavioral abnormality because the trial court "had no discretion to keep . . . Turner's answer[s] from the jury."

We review the trial court's evidentiary rulings for an abuse of discretion. *See Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex. 2000); *In re Commitment of Stuteville*, 463 S.W.3d 543, 554 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). A trial court abuses its discretion when its evidentiary ruling is arbitrary, unreasonable, or without reference to any guiding rules or principles. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012); *In re Commitment of Burd*, 612 S.W.3d 450, 461 (Tex. App.—Houston [1st Dist.] 2020, pet. denied). If the trial court erred in excluding evidence, we will not reverse unless we determine that the error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a)(1); *State v. Cent. Expy. Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). In making that determination, we are required to review the entire record. *Cent. Expy. Sign Assocs.*, 302 S.W.3d at 870.

Expert witnesses, particularly experts who provide scientific opinion evidence, may be properly questioned about the potential rates of error underlying

27

their theories or techniques. *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995); *see also In re Commitment of Alexander*, No. 09-11-00650-CV, 2013 WL 5425557, at \*4 (Tex. App.—Beaumont 2013, pet. denied) (mem. op.) (questions about general accuracy of expert's opinions concerning testimony's subject matter are relevant inquiries). In *Robinson*, the Texas Supreme Court set forth six non-exclusive factors for courts to consider whether an expert's opinions are reliable and admissible. *See Robinson*, 923 S.W.2d at 557. But not every *Robinson* factor will apply in every case, particularly when the proffered expert testimony is not scientific in nature. *See Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 579 (Tex. 2006).

Here, Turner, during his testimony, made clear that he was not predicting appellant's future behavior, only rendering an opinion based on whether appellant displayed certain characteristics that had been identified through research as risk factors that increased an individual's likelihood of reoffending. Appellant did not explain to the trial court how the information he sought to elicit from Turner was relevant to the issue of whether Turner's testimony was reliable. *See* TEX. R. EVID. 401.

Further, the trial court may exclude even relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." TEX. R. EVID. 403. The trial court could have

reasonably concluded that the information sought by appellant was potentially confusing or misleading. *See In re Commitment of Alexander*, 2013 WL 5425557, at *4 ("[Q]uestions that fail to account for the effects of sex offender treatment based on the physician's patient population or the population he relied on when assessing the patient c[ould not] assist the jury in determining whether the expert ha[d] in the past correctly applied the techniques developed to determine which persons need[ed] sex offender treatment to prevent re-offending."); *see also In re Commitment of Golihar*, 224 S.W.3d 843, 847 n.4 (Tex. App.—Beaumont 2007, no pet.) (citing problems with using recidivism statistics as basis for demonstrating offender's risk of being convicted of additional sex crimes in future). Based on the foregoing, we hold that the trial court did not err in sustaining the State's objection and preventing him from eliciting certain testimony from Turner.

We overrule appellant's second issue.

## Sufficiency of Evidence

In his third and fourth issues, appellant argues that the evidence is legally and factually insufficient to support the jury's finding that he was a sexually violent predator because the evidence presented at trial did not "support [the] finding beyond a reasonable doubt."

A commitment proceeding under the SVP Act is a civil proceeding that incorporates the "beyond a reasonable doubt" standard of proof typically reserved

for criminal cases. *In re Commitment of Stoddard*, 619 S.W.3d 665, 668 (Tex. 2020) (proceeding under SVP Act is "the rare civil case in which the burden of proof is beyond a reasonable doubt"). Thus, in reviewing a jury verdict in an SVP Act case for legal sufficiency of the evidence, we use the appellate standard of review applied in criminal cases. *Id.* at 675.

In evaluating the legal sufficiency of the evidence in an SVP Act case, we review the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could find, beyond a reasonable doubt, the elements required for commitment under the SVP Act. *Id.* "It is the fact finder's responsibility to fairly resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts." *In re Commitment of Stuteville*, 463 S.W.3d at 551; *see also In re Commitment of Mullens*, 92 S.W.3d 881, 887 (Tex. App.— Beaumont 2002, pet. denied) (stating fact finder may resolve conflicts and contradictions in evidence "by believing all, part, or none of the witnesses' testimony").

In evaluating the factual sufficiency of the evidence in an SVP Act case, we must "determine whether, on the entire record, a reasonable factfinder could find beyond a reasonable doubt that the defendant is a [sexually violent predator]." *In re Commitment of Stoddard*, 619 S.W.3d at 668. In doing so,

> [we] may not usurp the jury's role of determining the credibility of witnesses and the weight to be given their testimony, and [we] must

presume that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so. If the remaining evidence contrary to the finding is so significant in light of the entire record that the factfinder could not have determined beyond a reasonable doubt that its finding was true, the evidence is factually insufficient to support the verdict.

*Id.*

In a suit to commit a person as a sexually violent predator, the State must prove beyond a reasonable doubt that the person is (i) a "repeat sexually violent offender" and (ii) "suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." TEX. HEALTH & SAFETY CODE ANN. §§ 841.003(a), 841.062(a). A person is a repeat sexually violent offender if he has been convicted of more than one sexually violent offense and a sentence was imposed for at least one of the offenses. *Id.* § 841.003(b); *see also id.* § 841.002(8) (defining sexually violent offense). A behavioral abnormality is a "congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2). A "predatory act" is an "act directed toward individuals, including family members, for the primary purpose of victimization." *Id.* § 841.002(5).

Appellant argues that because Turner's testimony was conclusory and speculative, no rational fact finder could have found that he was a sexually violent

predator beyond a reasonable doubt as required for civil commitment under the SVP Act.

Where an expert has (1) explained the accepted methodology that he employed to formulate his opinion, which is routinely used by experts in the same field, (2) offered a basis for his opinion, including interviews and review of the records, and (3) explained why the information relied on supports his opinion, the expert's testimony is not conclusory, and thus has probative value. *In re Commitment of Summers*, No. 01-19-00738-CV, 2021 WL 3776751, at *13 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (mem. op.).

Here, appellant does not identify any specific examples of what he considers to be speculative and conclusory testimony from Turner, and our review of his testimony set forth above demonstrates that Turner's testimony satisfies the criteria that we set forth in *In re Commitment of Summers*. During his testimony, Turner explained that he relied on prison and other records about appellant and completed his own interview of appellant to identify the specific behaviors of appellant that supported his diagnoses and conclusions. In determining that appellant had a high level of psychopathy, Turner applied the PCL-R, a "widely used instrument to measure psychopathic characteristics in an individual," to identify certain personality traits in appellant that were "typically found" in "psychopathic individuals." He linked his identification of those personality traits to examples of

32

appellant's conduct. For example, Turner explained that appellant's actions that resulted in having his probation revoked exhibited "poor behavior control" and "impulsivity."

Turner also detailed the circumstances that resulted in appellant's arrest and conviction for his first indecency-with-a-child offense and pointed out the risk factors that supported his conclusion that appellant had a behavioral abnormality, including the fact that appellant was on probation when he committed his first indecency-with-a-child offense, the youth of the complainant, the fact that appellant and the complainant "were strangers on the day of the offense," appellant's numerous sexual misconduct infractions while in prison, and the fact that he committed his second indecency-with-a-child offense only eight months after his release from confinement for the failure-to-register offense. Turner described appellant's impulsive conduct and sexually deviant behavior in support of his conclusion that appellant had a behavioral abnormality.[12]

---

[12] Appellant mischaracterizes Turner's testimony that there is a difference between the legal meaning of a term and the mental-health meaning of the same term, here "behavioral abnormality," by analogizing it to the difference between the legal meaning of "competent" and the mental health meaning of "competent." We do not view Turner's effort to describe this difference to the jury by applying it to a more commonly known term as showing any lack of understanding of the term "behavioral abnormality."

As to Turner's testimony about the significance of an offender admitting to his offense, appellant appears to have a difference of opinion with Turner about what the offender's denial or admission signifies. Appellant also expresses disagreement with the weight that Turner gave to appellant's score on the PCL-R in concluding that appellant had a behavioral abnormality. But appellant did not present controverting testimony on this issue, and Turner was not obliged to endorse or even address appellant's unspoken views on those issues.

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could find, beyond a reasonable doubt, that appellant is a sexually violent predator. *See In re Commitment of Stoddard*, 619 S.W.3d at 675. Further, considering the entire record, we conclude that a reasonable factfinder could find beyond a reasonable doubt that defendant is a sexually violent predator. *See id.* Thus, we hold that the evidence is legally and factually sufficient to support the jury's finding that appellant is a sexually violent predator.

We overrule appellant's third and fourth issues.

## Conclusion

We affirm the trial court's judgment.

Julie Countiss
Justice

Panel consists of Justices Kelly, Hightower, and Countiss.